**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| PATRICIA LONERGAN,<br><br>    individually and on<br>    behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>        v.<br><br>KNORR-BREMSE AG<br>Moosacher Str. 80<br>Munchen, 80809<br>Germany<br><br>KNORR BRAKE COMPANY LLC<br>1 Arthur Peck Drive<br>Westminster, Carroll County, Maryland 21157<br><br>NEW YORK AIR BRAKE LLC<br>748 Starbucks Avenue<br>Watertown, New York 13601<br><br>WESTINGHOUSE AIR BRAKE<br>TECHNOLOGIES CORPORATION<br>1001 Air Brake Avenue<br>Wilmerding, Pennsylvania 15148<br><br>WABTEC PASSENGER TRANSIT<br>P.O. Box 11<br>Spartanburg, South Carolina 29304<br><br>FAIVELEY TRANSPORT, S.A.<br>3, rue du 19 mars 1962<br>92230 Gennevilliers<br>France<br><br>FAIVELEY TRANSPORT<br>NORTH AMERICA, INC.<br>50 Beechtree Boulevard<br>Greenville, South Carolina 29605<br><br>      Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Patricia Lonergan brings this action under the antitrust laws of the United States

on behalf of herself and a class of all others similarly situated (the "Class," defined below),

against Defendants Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC (collectively, "Knorr"), Westinghouse Air Brake Technologies Corporation, Wabtec Passenger Transit (collectively, "Wabtec"), Faiveley Transport, S.A., and Faiveley Transport North America, Inc. (collectively, "Faiveley"), based on Defendants' and unnamed co-conspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation. Plaintiff brings this action to recover damages, including treble damages and other appropriate relief, and further alleges as follows:

## SUMMARY OF THE ACTION

1.      This is an antitrust class action brought by and on behalf of individuals who have performed work for Defendants, who are some of the world's largest rail equipment suppliers and subsidiaries or business units thereof. Rail equipment personnel, like personnel in any labor market, benefit when their employers compete for their services. Competition in the labor market creates leverage for personnel, which in turn leads to higher wages and greater mobility.

2.      From at least 2009 to on or around April 3, 2018, Defendants, along with other unnamed individuals and entities acting as co-conspirators, conspired not to recruit, solicit, or hire without prior approval each other's personnel (the "No-Poach Conspiracy" or "Conspiracy"). The No-Poach Conspiracy, which is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, limited Plaintiff's and Class members' job mobility and suppressed their compensation below the levels that would have been available absent the Conspiracy.

3.      On April 3, 2018, Defendants Knorr and Wabtec announced their agreement to settle charges brought by the Department of Justice ("DOJ"), following the DOJ's investigation of the No-Poach Conspiracy. The DOJ charged and Defendants Knorr and Wabtec did not

dispute that Defendants' agreements were *per se* violations of the Sherman Act. The DOJ charged and Defendants did not dispute that these agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry." Specifically, the DOJ further charged and Defendants did not dispute that "these agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

4.       Although the DOJ and Defendants have reached a settlement, pursuant to which Defendants have agreed to certain ongoing conduct remedies, the DOJ settlement does not provide compensatory or retrospective relief for those who were injured by the No-Poach Conspiracy. Without this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the ill-gotten benefits of their unlawful collusion.

## JURISDICTION AND VENUE

5.       Plaintiff brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.       The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

7.       Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the

affected interstate trade and commerce was carried out in this District, and one or more Defendants resides in, can be found in, and/or transacts business in this District.

8.      Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Maryland. In particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District. Additionally, both Knorr and Wabtec have facilities and personnel working in the state of Maryland.

## THE PARTIES

9.      Plaintiff Patricia Lonergan is an individual residing at 10079 Kingston Ct, Highlands Ranch, Colorado, 80130. During the Class Period, Ms. Lonergan worked for wholly-owned subsidiaries of Defendant Westinghouse Air Brake Technologies Corporation. In particular, in or around 2013, Ms. Lonergan joined Xorail, Inc., a wholly-owned subsidiary of Defendant Westinghouse Air Brake Technologies Corporation, as a Positive Train Control ("PTC") Systems Integration Manager in Denver, Colorado. During Ms. Lonergan's tenure at Xorail, Inc., the PTC section she managed became a separate entity known as Wabtec Integrated Systems, which was also a wholly-owned subsidiary of Defendant Westinghouse Air Brake Technologies Corporation. During her time at Xorail and Wabtec Integrated Systems , Ms. Lonergan also worked closely and on a daily basis with employees of Defendant Wabtec Passenger Transit. As a result of the No-Poach Conspiracy, Ms. Lonergan's compensation was

suppressed during the time she worked for Defendant Westinghouse Air Brake Technologies Corporation.

10.     While employed by Defendant Westinghouse Air Brake Technologies Corporation, Ms. Lonergan sought, applied for, and interviewed for positions at Defendant Knorr-Bremse AG, including at Knorr's wholly owned subsidiary Defendant New York Air Brake LLC. Ms. Lonergan possessed the requisite skills and experience and was well-qualified for the positions she sought at Defendant Knorr-Bremse AG, including at Knorr's wholly owned subsidiary Defendant New York Air Brake LLC. However, as a result of the No-Poach Conspiracy between Defendants, Ms. Lonergan was unable to be hired at those positions. Upon information and belief, but for the No-Poach Conspiracy, Ms. Lonergan would have been hired at those positions at Defendant Knorr-Bremse AG, including at Knorr's wholly owned subsidiary Defendant New York Air Brake LLC, for which she was well-qualified.

11.     Defendant Knorr-Bremse AG is a privately owned German company with headquarters in Munich, Germany. Knorr-Bremse AG is a leading manufacturer, developer, and seller of rail and commercial vehicle equipment, and holds several wholly owned subsidiaries in the United States.

12.     Defendant Knorr Brake Company LLC is a Delaware corporation with headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. Knorr Brake Company manufactures systems such as train control, braking, and door equipment used on passenger rail vehicles.

13.     Defendant New York Air Brake LLC is a Delaware corporation with headquarters in Watertown, New York, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. It manufactures railway air brakes and other rail equipment used on freight and

passenger trains. Unless otherwise specified, a reference to "Knorr" shall include each of Knorr-Bremse AG, Knorr Brake Company LLC and New York Air Brake LLC.

14.     Defendant Westinghouse Air Brake Technologies Corporation is a Delaware corporation with headquarters in Wilmerding, Pennsylvania, and is a leading provider of freight and passenger rail equipment and services.

15.     Defendant Wabtec Passenger Transit is a business unit of Westinghouse Air Brake Technologies Corporation, and is based in Spartanburg, South Carolina. Unless otherwise specified, a reference to "Wabtec" shall include each of Westinghouse Air Brake Technologies Corporation and Wabtec Passenger Transit.

16.     Until on or about November 30, 2016, Defendant Faiveley Transport S.A. was a French société anonyme based in Gennevilliers, France, and was also a leading rail equipment manufacturer and supplier. In the United States, Faiveley conducted business through its wholly owned subsidiary Defendant Faiveley Transport North America, Inc., a New York corporation with headquarters in Greenville, South Carolina. Unless otherwise specified, a reference to "Faiveley" shall include each of Faiveley Transport S.A. and Faiveley Transport North America, Inc.

17.     On or about November 30, 2016, Defendant Westinghouse Air Brake Technologies Corporation acquired Defendant Faiveley Transport S.A.

18.     Each Defendant co-conspirator acted as the principal of or agent for each other Defendant co-conspirator with respect to the acts, violations, and common course of conduct alleged herein.

19.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit and the identities of which are presently

unknown, have participated as co-conspirators with the defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities at a later date.

20.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

21.     When Defendants engaged in conduct in relation to the No-Poach Conspiracy, they did not differentiate among the members of a corporate family. For example, if a Defendant or a representative of a Defendant referred to "Knorr," all other Defendants understood that to refer to each of the Knorr Defendants named in paragraphs 11 through 13.

## FACTUAL ALLEGATIONS

### A.     Trade and Commerce

22.     Throughout the Class Period (defined below), Defendants employed Class members throughout the United States, including in this District.

23.     Defendants' conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

### B.     Defendants' Railway Components and Systems

24.     Defendants share a long history of developing, manufacturing, and selling similar or related products in the rail industry, and, in particular, in relation to railway brake systems.

25.     In the absence of Defendants' anticompetitive conduct, competition between and among Defendants for skilled workers in the highly specialized, technical, and insular rail supplier industry, particularly in the railway brake and related monitoring and control systems sector, would be robust and would have increased and enhanced the workers' wages and mobility.

**a.     Railway Brake Systems Background**

26.     Modern railway trains rely on a power braking system that uses compressed air as the operating medium – that is, an air brake system.

27.     The straight air system is the simplest form of the air brake and uses pressurized air delivered through a series of pipes and hoses under the rail cars known as a "train line" to push on pistons that engage the brake shoes on train wheels.

28.     In 1868, George Westinghouse introduced a version of the air brake in the United States.  Westinghouse Air Brake Company ("WABCO"), the predecessor in interest to Defendant Wabtec, was organized in 1869 to manufacture and sell Westinghouse's invention.  Defendant Wabtec was formed in 1999 through the merger of WABCO and MotivePower Industries Corporation.

29.     Westinghouse later developed and sold an improvement to the straight air brake, which would become known as the Westinghouse air brake. Instead of sending air through the train line to activate the brakes, the Westinghouse air brake used a **reduction** in air pressure in the train line to apply the brakes. To implement the Westinghouse air brake system, each piece of a railroad rolling stock in a train was equipped with an air reservoir and a multifunctional triple valve. The Westinghouse system avoids the primary risk associated with straight air systems, wherein any separation between the pipes and hoses of the train line can

cause a loss of air pressure and hence the loss of braking power. In the Westinghouse air brake system, by contrast, if air flow in the train line is disrupted by any hose or pipe separation, the reduced pressure in the train line will cause the brakes to apply. Accordingly, the fail-safe Westinghouse air brake system, in various updated forms, has been nearly universally adopted and improved upon.



**Figure 1: Diagram of an Air Brake System on Vehicle in Release Position** [1]



**Figure 2: Diagram of an Air Brake System on Vehicle in Application Position** [2]

---

[1] http://www.railway-technical.com/trains/rolling-stock-index-l/train-equipment/brakes/
[2] *Id.*

30.     The Kunze-Knorr brake system was introduced by Georg Knorr and has been manufactured by his company, Defendant Knorr-Bremse ("bremse" means "brake" in German), since 1905. The Kunze-Knorr brake system uses the same working principle as the Westinghouse air brake and is a widely used, if not the leading, air brake system in European railways.

31.     Defendant Faiveley has specialized in electromechanical parts, particularly for railways, since its founding in 1919. Since the 1960s, Faiveley has focused on adapting electronic applications to the railroad industry. In 2004, Faiveley acquired SAB Wabco, a corporate descendent of WABCO that specialized in the design, manufacture, and marketing of brake systems, wheels, and couplings for the railway industry. At the time of its acquisition by Defendant Wabtec in 2016, Faiveley was the world's third-largest rail equipment supplier behind Defendant Wabtec and Defendant Knorr.

**b.     Modern Enhancements in Air Brake Systems**

32.     Electro-pneumatic ("EP") air brakes were introduced in Europe in the 1950s and were widely adopted in Europe, particularly in British railway trains. EP air brakes allow for immediate and simultaneous application of brakes throughout the train instead of sequential application down the train line as in traditional Westinghouse air brake systems. In an EP brake system, a distributor, performing functions similar to those of the triple valve, is operated directly and instantly by electrical control from the train driver's brake valve. The first EP systems maintained the same Westinghouse setup: brake cylinders, air reservoirs, and pumps. Only the means of transmitting the driver's brake command was changed. If the electrical system failed, the driver could still activate the Westinghouse air brake to apply the brakes sequentially by reducing the flow of air through the train line.

33.     Contemporary EP braking systems no longer rely on the Westinghouse triple valve. But, like the progression from the straight air brake to the Westinghouse air brake, the EP brake system also evolved into a fail-safe system. Electrical current is now required to **release** the brakes rather than to apply them; thus, its absence in an electrical failure or train separation would cause the brakes to apply.



**Figure 3: Schematic for EP brake control** [3]

34.     The latest innovation in railway air brakes is the electronically controlled pneumatic ("ECP") air brake system. In an ECP system, the brakes of all the train cars and locomotives are connected by a local area network through a trainline cable that allows individual control of the brakes on each car and the reporting back of the performance of each car's brakes. The ECP system also allows the brake pipe to remain charged during operation, thus decreasing the likelihood of exhausting the air supply used for braking. Testing of ECP

---

[3] http://www.railway-technical.com/trains/rolling-stock-index-l/train-equipment/brakes/electro-pneumatic-brakes-d.html

air brake systems began in the 1990s in the U.S., and the first revenue service freight train fitted with ECP brakes in the U.S. began operating in 2007.

35.     The **only** manufacturers of railway ECP air brake systems in the U.S. are Defendant New York Brake Company and Defendant Wabtec.

36.     Between May 2015 and December 2017, during the Class Period, the United States Department of Transportation ("DOT") imposed a final rule that newer tank cars used to haul certain hazardous or flammable materials must be equipped with ECP brake systems.

**c.     Train Control, Monitoring, and Other Systems**

37.     As air brake systems have become more sophisticated, they have led to related technological and safety advancements in other rail components and systems, and Defendants have expanded into those areas.

38.     For instance, in many modern systems, the main air pipe running through a train is used to control train doors as well as the brakes. There are similar synergies with climate-control systems. Because of that interconnectedness, Defendants Knorr, Wabtec, and Faiveley all manufactured and sold door systems and HVAC systems in addition to braking systems.

39.     Similarly, as technology has evolved to allow real-time recording and reporting of braking and other rail component performance data, Defendant competitors and their co-conspirators have developed increasingly sophisticated integrated driver assistance and train control systems. For example, until the 1990s, compliance with railway signals and safety rules relied almost exclusively on implementation by human crewmembers. But advanced software and hardware systems, as well as wireless communication technologies, can now

connect braking systems with integrated data systems that track, report, or control the performance of other train components and systems.

40.     Defendants provide customers with hardware and software products and services for such train control and monitoring. To function properly, many train control systems require not only software and hardware train control products but also specialized knowledge of those integrated systems. Defendants therefore develop and supply train control products as well as substantial and specialized services to their customers, including implementation, field testing, and ongoing training and maintenance services.

41.     These technological innovations have had a large impact on the rail industry in recent years. For example, the Rail Safety Improvement Act of 2008 required the implementation of Positive Train Control ("PTC") systems on all or nearly all major freight and intercity passenger or commuter rail lines. PTC systems are one of the most advanced types of train control systems. Instead of sending a signal to order a train to stop, *i.e.*, a "negative train control," when a problem arises, a train using a PTC system can only move when given a positive allowance to do so. An integrated PTC system uses GPS navigation to set or update each trains' allowed course and speed. If a train attempts to make an unauthorized movement, *e.g.*, exceeding the authorized speed limit or switching to the wrong track because of human operator error or a faulty switch, the PTC applies the braking system and halts the movement. In this manner, the rollout of PTC systems follows the historical trend in the railway braking systems industry of moving toward increasingly sophisticated fail-safe engineering systems.

42.     In short, Defendant Knorr and Defendant Wabtec have for many decades developed, manufactured, and sold highly related and/or similar products in a specialized and

increasingly sophisticated industry, particularly in relation to the railway air brake and related control systems on which their businesses are based. As a result, the anticompetitive No-Poach Conspiracy significantly depressed if not eliminated meaningful employment competition for Defendants' skilled rail workers in this specialized, technical, and insular industry. For example, as to workers with specialized expertise in ECP brake systems, the No-Poach Conspiracy effectively foreclosed half of these workers' employment prospects and virtually all of their external mobility.

## C.    Rail Equipment Market

43.    Knorr and Wabtec are the world's leading rail equipment suppliers, are rivals in the development, manufacture, and sale of freight and passenger rail equipment, and compete with each other, including through subsidiaries, both worldwide and in the United States. Before its acquisition by Wabtec, Faiveley was the world's third-largest rail equipment supplier and also competed for business with Knorr and Wabtec.

44.    Both Knorr and Wabtec – including their many subsidiaries – create and sell a wide range of systems and products for the broader freight and passenger rail industries. Knorr, for example, manufactures braking systems, door systems, air conditioning systems, derailment detectors, and train control and monitoring technology, among other things. Similarly, Wabtec manufactures central diagnostic systems, braking systems, door systems, temperature control systems, and train control and monitoring technology, in addition to other products. Wabtec also builds new locomotives.

45.    The business activities Knorr and Wabtec perform are classified under North American Industry Classification System ("NAICS") code 3365/33651/336510 by the United States Bureau of Labor Statistics for railroad rolling stock manufacturing.

46.     The railroad rolling stock manufacturing code includes companies that engage in one of more of the following:

        a)     manufacturing and/or rebuilding locomotives, locomotive frames and parts;

        b)     manufacturing railroad, street, and rapid transit cars and car equipment for operation on rails for freight and passenger service; and

        c)     manufacturing rail layers, ballast distributors, rail tamping equipment and other railway track maintenance equipment.

47.     This sector had a product shipment value of over $22 billion in 2015.

48.     According to the Bureau of Labor Statistics, there were approximately 30,000 individuals employed in this sector in the United States in 2015.

49.     Knorr had annual revenues of $7.7 billion in 2017 and has approximately 28,000 employees worldwide.

50.     Wabtec had global sales of $3.9 billion in 2017 and has approximately 20,000 employees worldwide.

51.     Faiveley Transport, S.A., was acquired for $746.5 million by Wabtec in or around November 2016. In 2016, Faiveley had revenues of €1.2 billion.

52.     Both Knorr and Wabtec have dozens of subsidiaries, some of which are based in the United States.

**D.     Rail Industry Associations**

53.     The railway industry in general is concentrated, insular, and close-knit, and supports a number of industry associations that facilitate interaction, sharing of information, and coordination between its members. The primary rail associations in the United States

include: American Association of Railroad Superintendents (AARS); American Association of State Highway and Transportation Officials (AASHTO); American Public Transportation Association (APTA); American Railway Engineering and Maintenance-of-Way Association (AREMA); American Short Line and Regional Railroad Association (ASLRRA); Association of American Railroads (AAR); National Association of Railroad Passengers (NARP); North American Rail Shippers Association (NARS); and United States High Speed Rail Association(USHSR).

54.    More particularly, within the rail industry, the railway supplier sector organizes through the Railway Supply Institute ("RSI"), an all-inclusive trade association with over 250 railway supplier company members, including Defendants Knorr, Wabtec, and, upon information and belief, Faiveley before it was acquired by Wabtec. RSI facilitates and encourages the sharing of key industry information among its members. For example, an RSI committee regularly prepares and distributes statistics on North American freight car orders, deliveries, and backlogs to its affiliate members. According to RSI's most recent Annual Report, Jason Connell of Defendant New York Air Brake and Jeff Stearns of Defendant Wabtec both serve on RSI's Board of Directors. In addition, Jim Frantz of Defendant Wabtec is the Immediate Past President of RSI.

55.    Even more particularly, within railway suppliers, the railway air brake sector, which also includes Defendants Knorr, Wabtec, and Faiveley, organizes through Air Brake Association ("ABA"). A longstanding insular group, the ABA has met regularly since 1893. Defendant New York Air Brake, Defendant Wabtec, and RSI are three of the seven Partners of the ABA.

56.     Upon information and belief, Defendants used these trade associations, including meetings, conventions, and discussions, and their membership and leadership therein to share information, including as to their employees, and to form, reach, confirm, perpetuate, and enforce agreements as to anticompetitive conduct, including in furtherance of their No-Poach Conspiracy.

### E.     Rail Equipment Labor Market

57.     There has been and continues to be a shortage of labor in the rail industry in the United States.

58.     The rail industry failed to retain younger employees during the 1990s and now employs a significant number of employees 40 years of age or older. Consequently, there is high demand for and limited supply of skilled employees who have rail experience. Thus, as the DOJ found, firms in the rail industry can experience vacancies in critical roles for months.

59.     The DOT's Federal Railroad Administration ("FRA") published a study on the railroad industry workforce in October 2011.[4] The study found that, as of 2010, a pending increase in demand coupled with an aging workforce nearing retirement may lead to shortages in qualified workers:[5]

> In 2010, the railroad industry is anticipating a pending growth spurt fueled by a new national interest in green initiatives, monetary infusion through the American Recovery and Reinvestment Act of 2009, establishment of a high-speed rail system in the United States, and a host of other high-tech projects that stand to boost both safety and reliability across the railroad network. This increase in demand coupled with the probability of large numbers of retirees leaving the industry and an immature pipeline of talent flowing in to assume those vacated positions requires swift planning and collaboration on workforce issues for rail.

---

[4] https://www.fra.dot.gov/eLib/details/L01294
[5] *Id*. at p. 8.

60.     The DOT FRA study further found that, particularly as to railway manufacturers and suppliers, the advancement of technology likely may exacerbate the shortage in qualified rail workers by necessitating skills in more specialized fields:[6]

> As more technology is infused into the railroad industry, the need for increased integration of components and technologies also increases. This is fueling an increase in nontraditional skill sets such as electrical engineering, Radio Frequency (RF) engineers, and computer science disciplines.

61.     The DOT FRA published a railway workforce study update in April 2016. The study update showed that an aging workforce with a shortage of qualified skilled replacements continues to be a challenge for the industry and a central concern of industry stakeholders.



**Figure 4: Railroad Industry Age Distribution in 2008, 2010 and 2012** [7]

62.     The study update confirmed the findings of the 2011 study as to shortages in skilled employees and indicated that rail companies are struggling to find potential employees that possess the appropriate science, technology, engineering, and mathematics ("STEM") skills

---

[6] *Id.* at p. 14.
[7] https://www.fra.dot.gov/eLib/details/L17406#p1_z5_gD_lRT_y2016_m4 at p. 1.

and specialty skills possessed by certain professions like welders and electricians.[8] At the largest and most sophisticated rail companies, there is always a need for recruiting of specialty and STEM disciplines, including composite employees – those with railroad experience coupled with technological savvy to handle new technologies as they are implemented.[9] The 2016 study update concluded that "[t]he railroad industry will encounter increased competition for talent while the current workforce challenges facing the industry . . . will become more important."[10]

63.     As alleged in the DOJ's complaint, Defendants compete with each other to attract, hire, and retain various skilled employees, including rail industry engineers, project managers, and sales executives.

64.     Upon information and belief, Defendants' own hiring practices, including for the positions discussed by the DOJ complaint, indicate that experience in the rail industry is required or highly preferred across a wide variety of employment and independent contractor positions.

a)     **Engineers**: Defendants frequently need to hire or contract various types of engineers, from research and development, design, field testing, electronics hardware and software development, systems integration, to project engineering. For example:

- Mechanical design engineers are typically primarily responsible for the design and development of, *e.g.*, rail brake or door system components. Due to the bespoke nature of many such components,

---

[8] *Id*. at p. 21.
[9] *Id*.
[10] *Id*. at p. 24.

design engineers typically must generate component and assembly designs based on customer, as well as internal, specifications. In addition to mechanical engineering degrees and experience, rail industry experience is usually highly preferred, if not a requisite, as design engineers are often required, for example, to provide manufacturing, purchasing, and quality support.

• Software engineers develop, test, and implement various rail software applications, including, *e.g.*, train control and monitoring software. Such positions generally require a computer science or electrical engineering degree as well as years of experience in the railroad industry. Jobs can require communication with customers and the FRA. Defendants thus typically require the employee or contractors understand railroad or rail transit operations, processes and procedures.

• Systems engineers include, *e.g.*, Reliability, Availability, Maintainability, and Safety engineers as well as train control and monitoring system developers and testers. These positions generally require a strong technical understanding of an entire rail safety or efficiency system as well as an ability to communicate with rail industry customers and development teams. Thus, Defendants typically seek to fill the contracts with individuals who not only have systems engineering degrees but also have years of experience in the rail or rail transit industry.

- Project engineers, meanwhile, work closely with Marketing and Project Managers to deliver Defendants' components and systems to customers on particular projects. In addition to requiring similar technical education, skills, and knowledge as for the other engineering positions described, Defendants generally place a particularly high premium on project engineers' ability to communicate with rail customers and the project team.

In sum, in addition to degrees in the relevant engineering field, Defendants generally seek engineering candidates with experience in the industry, including familiarity with regulations, standards, and recommended practices specific to the rail and rail transit industry, such as those put out by the FRA, the Federal Transit Authority, the AAR, and AREMA.

b) **Project Managers:** The primary responsibility of project managers at Defendant companies is to ensure an overall rail project and any related services are completed on time, within budget, and according to rail customer needs. The project manager is the key liaison between the rail project team and the rail customer across the definition, development, field testing, rollout, claims management, and aftermarket maintenance support and stages of a rail project, *i.e.*, "from the first request of the customer to the end of the warranty period." Specific responsibilities generally include coordinating, managing, and communicating (a) internal project plans and status, (b) change orders, (c) invoicing, and (d) contracts. Core responsibilities such as setting, clarifying, and implementing the exact definition of delivery and scope of supply require extensive communication with the rail customer as well as close supervision of

and coordination with engineers on the project team. Thus, Defendants typically require or strongly prefer that project managers have strong communication skills and fluency in the type of technical engineering projects they manage. As a result, these positions place high import on an employee's years of experience in the rail industry as well as their relevant engineering background and education (*e.g.*, systems engineering degree for a control systems project).

c) **Sales Representatives:** Sales representatives at Defendant companies are primarily responsible for making sales of Defendants' rail components, systems, or services to new and existing customer accounts. Their job duties often include developing business plans; collecting market intelligence; preparing proposals, bids, and quotes; and establishing and maintaining positive customer relationships and satisfaction. They are frequently the "key point of contact" responsible for interfacing with customers and technical representatives during the bid phase. Thus, Defendants often seek sales representatives who have, *e.g.*, a "good technical understanding" of the particular railway products or services they are selling and an "ability to communicate with a technically oriented customer." To meet that profile, Defendants typically seek candidates with engineering degrees and experience in or demonstrated knowledge of the rail or rail transit industry.

65. In addition to competing for business, Knorr and Wabtec – and their many subsidiaries – also ostensibly compete with each other to attract, hire, and retain skilled labor with rail industry experience, who are in high demand and limited supply. Personnel of other

entities within the rail industry are thus key sources of potential talent to fill open positions at companies such as Knorr and Wabtec.

66.     As the DOJ found in its investigation of Defendants, companies in the rail industry not only receive direct applications from individuals who are interested in potential employment opportunities, but also directly solicit skilled labor from other entities in the rail industry. This type of recruiting often involves "cold calling," or communicating directly with an individual who has not otherwise applied for a position. Firms in the rail industry rely on direct solicitation or cold calling of employees of other rail companies because the skilled labor of other companies within the rail industry have the requisite specialized skills and may be unresponsive to other methods of recruiting. Moreover, the rail industry is an insular industry where vacancies are filled by workers already employed within the industry.

67.     Cold calling and other employee poaching methods also significantly impact compensation in a number of ways.

68.     First, direct solicitation provides personnel with valuable information about the labor market that they would not otherwise have, and thus also gives them leverage in negotiations. When an individual receives a cold call from a rival company with an offer that exceeds her current compensation, she can accept that offer and change employers, or she can use the offer to negotiate increased compensation from her current employer. Either way, she can use the competition between the companies to increase her own compensation.

69.     Second, through cold calling a company also gathers information about the rival's compensation practices. This increase in information and transparency regarding compensation has the effect of increasing compensation, in turn, because employers are

pressured to match or exceed a rival's compensation package in order to recruit and retain quality skilled labor.

70.     Third, when a company anticipates that its personnel will be cold called by its rivals and thus tempted to change employers, the company will preemptively increase compensation in order to reduce the risk of poaching.

71.     These effects are not limited to individuals who have received cold calls or applied for jobs at rival companies, but instead extend to all personnel. For example, an individual who has received a cold call and gained information about a rival's compensation can share that information with her colleagues, who can also use it to negotiate pay increases or obtain offers from the rival company, even though they did not receive cold calls themselves.

72.     Additionally, companies monitor and manage their internal compensation structures to achieve certain goals, such as maintaining approximate compensation parity among personnel within the same job categories and certain compensation relationships across different job categories and levels of seniority. To accomplish these and other objectives, including recruiting and retaining skilled labor, companies set baseline compensation levels for their various job categories. These baseline levels are affected by the factors discussed above – so, for example, a company may be forced to increase a particular baseline compensation level if the affected individuals are being poached by rivals with better offers. The reverse is also true: if its personnel are not being poached, a company can keep its baseline compensation at lower levels.

73.     When a company negotiates compensation with an individual, the negotiation is, at the very least, profoundly influenced by the baseline compensation level. Accordingly, the suppression of baseline compensation results in the suppression of total compensation.

74.     In short, in a competitive labor market, rail industry employers compete with each other to attract highly skilled individuals. This competition benefits labor because it increases awareness of available job opportunities and improves an individual's ability to negotiate for a better salary and other terms of employment. These benefits extend to all, including those who do not intend to move between companies, because, among other things, employers have incentives to offer competitive baseline pay levels and maintain internal equity in their compensation structures.

75.     As alleged in the DOJ complaint, the no-poach agreements at issue disrupted these normal competitive mechanisms within the labor market for rail industry personnel, harming competition and thus the Class members.

### F.     DOJ Investigation

76.     Beginning in or around 2016, the Antitrust Division of the United States Department of Justice conducted an investigation into the employment practices of Defendants. As a result of its investigation, the DOJ concluded that Defendants had agreed to unreasonable restraints of trade that were *per se* unlawful under the antitrust laws. Specifically, the DOJ said, the no-poach agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry." The DOJ also stated that "these agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

77.     On April 3, 2018, the DOJ filed a complaint alleging that Defendants' No-Poach Conspiracy violated Section 1 of the Sherman Act. The DOJ also filed a stipulated proposed final judgment in which Wabtec and Knorr agreed that the DOJ's complaint "state[d]

a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."

78.     In the stipulated proposed final judgment, Wabtec and Knorr are "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision." Wabtec and Knorr also agreed to comply with a variety of enforcement measures.

79.     The DOJ has not sought monetary penalties of any kind against Defendants and has made no effort to compensate individuals who were harmed by the Conspiracy. Thus, without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

**G.     The Conspiracy to Fix the Compensation of Their Personnel at Artificially Low Levels**

80.     As alleged in the DOJ complaint, beginning in January 2009, at the latest, Defendants entered into the No-Poach Conspiracy in order to eliminate competition between them for skilled labor. This overarching Conspiracy consisted of interconnected agreements that were developed, entered into, and enforced by Defendants' senior executives and reached some of the companies' United States subsidiaries and business units, including Knorr Brake Company LLC, New York Air Brake LLC, Wabtec Passenger Transit, Faiveley Transport North America, Inc., and other co-conspirators.

81.     These agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration.

82.     Defendants entered into the express agreements, and into the overarching conspiracy, with knowledge of the other Defendants' participation and with the intent of

26

accomplishing the Conspiracy's objective: to reduce compensation paid to individuals for their services, including to employees and contractors, by eliminating competition for skilled labor.

### i.     Wabtec-Knorr Agreement

83.     Beginning no later than 2009, Wabtec and Knorr Brake Company's senior executives entered into an express no-poach agreement, about which they directly communicated. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a Wabtec senior executive: "**[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'**"

84.     While Knorr Brake Company is a Knorr-Bremse AG subsidiary, Knorr-Bremse AG senior executives were aware of the agreement. Top Knorr executives in Germany were also included in key communications about this no-poach agreement.

85.     In furtherance of their agreement, Wabtec and Knorr Brake Company each instructed their outside recruiters not to solicit personnel from the other company.

86.     In at least some instances, Wabtec and Knorr Brake Company's no-poach agreement prevented them from considering unsolicited applications from the other firm's personnel, unless the other firm gave approval. For example, in 2010, a Knorr Brake Company senior executive stated that, without the permission of his Wabtec counterpart, he would not consider the application of Wabtec personnel who had applied to Knorr Brake Company.

87.     This agreement also reached other Wabtec and Knorr subsidiaries. For example, in July 2012, a New York Air Brake senior executive stated that he could not consider the application of Wabtec personnel due to Wabtec and Knorr's no-poach agreement.

88.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited an individual at Knorr Brake Company for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr personnel going forward due to the existing no-poach agreement between the companies.

###                     ii.      Knorr-Faiveley Agreement

89.     Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America entered into an express no-poach agreement that included commitments to contact each other before pursuing personnel of the other company. For example, in October 2011, a Knorr Brake Company senior executive stated in an email to an executive at Knorr-Bremse AG that a conversation with a Faiveley Transport North America executive had "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr Brake Company and Faiveley Transport North America actively managed the agreement with each other through direct communications.

90.     In or about 2012, executives from Knorr Brake Company and Faiveley Transport North America discussed the no-poach agreement at a trade show in Germany. Thereafter, the executives enforced the agreement through direct communications with each other and other senior executives at the two companies. For example, in October 2012, Faiveley

Transport North America executives stated in an internal communication that they were required to contact Knorr Brake Company before hiring a train brake engineer in the United States.

### iii.     Wabtec-Faiveley Agreement

91.     Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement, which included commitments to notify and obtain approval from each other before hiring each other's personnel.

92.     Executives from these two companies enforced their no-poach agreement through direct communication. For example, in January 2014, a Wabtec Passenger Transit executive explained to his colleagues that he could not engage in hiring discussions with Faiveley Transport North America personnel without first getting permission, stating that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]."

93.     Similarly, another Wabtec Passenger Transit executive informed his staff that hiring Faiveley Transport North America's personnel was "off the table" due to the no-poach agreement.

94.     Wabtec announced its intent to acquire Faiveley in July 2015. Faiveley is now a wholly owned subsidiary of Wabtec.

### CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action on behalf of herself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons who were paid for personal services by any of the Defendants, or by any wholly owned subsidiary of any Defendant, including Defendants' employees or contractors, at any time from January 1, 2009, to April 3, 2018. Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

96.     Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but based upon the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there are at least hundreds, if not thousands, of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

97.     The questions of law or fact common to the Class include, but are not limited to:

a.     whether the Conspiracy violated the Sherman Act;

b.     whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

c.     whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

d.     whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

e.     the type and measure of damages suffered by Plaintiff and the Class.

98.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

99.     Plaintiff's claims are typical of the claims of the Class.

100.     Plaintiff will fairly and adequately represent the interests of the Class and has no conflict with the interests of the Class.

101.     Plaintiff has retained competent counsel experienced in antitrust litigation, and specifically in "no poach" agreements, and class action litigation to represent herself and the Class.

102.     Defendants and the unnamed co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

103.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## ANTICOMPETITIVE EFFECTS

104.     The No-Poach Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing the compensation paid to their personnel at artificially low levels.

105.     Plaintiff and each member of the Class were harmed by every agreement alleged herein. The elimination of competition and suppression of compensation due to the Conspiracy affected all Class members. For example, Wabtec personnel received lower

compensation as a result of not only Wabtec's illicit agreements with Knorr Brake Company, but also as a result of Knorr's agreement with Faiveley, and so on.

106.    The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

107.    While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

108.    Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest—and they possess significant market power. Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the relevant market.

109.    Through their No-Poach Conspiracy, Defendants exercised and maintained this power, and did in fact suppress compensation and eliminate competition.

**PLAINTIFF'S CLAIMS ARE NOT LIMITED BY STATUTES OF LIMITATION**

110.    While Plaintiff had knowledge of aspects of Defendants' and industry hiring practices, Plaintiff had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until the DOJ's settlement with Defendants became public on April 3, 2018. Nor did Plaintiff have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiff that their compensation

was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiff therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

111.    Defendants publicly described themselves as competitors. Wabtec's 2017 Form 10-K listed Knorr as a principal competitor. Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." And in the related commercial vehicle market, Knorr identified WABCO (a trade name of Wabtec) as "its principal competitor." These statements indicated to Plaintiff that Defendants were competing, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

112.    Wabtec's 2017 10-K also stated that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including "conduct[ing] its business activities within the laws of host countries in which the Company operates." Knorr's Code of Conduct similarly states that the company "expect[ed] the entire workforce not only to observe internal regulations but also to observe the law." These statements indicated that Defendants were acting lawfully, not engaging in a long-running anticompetitive conspiracy to suppress the compensation of their employees.

113.    Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden, Defendants' discussions in furtherance of the conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters. Defendants relied on non-public forms of communication (e.g., private email) to effectuate their conspiracy and to avoid disclosure of the full scope of the conspiracy beyond the individuals involved.

114.     Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiff. While the DOJ has been investigating non-solicitation agreements since at least 2010—and has taken action against companies like Adobe, Apple, Ebay, Google, and Intel—the DOJ apparently only became aware of Defendants' conspiracy during its merger review of Wabtec's 2016 acquisition of Faiveley. Plaintiff was not a part of the merger review and did not have access to the documents provided to the DOJ as part of that review.

115.     As a result of Defendants' successful efforts to conceal the fact and scope of the No-Poach Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning Defendants' conspiracy.

### CLAIM FOR RELIEF
### (Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3)

116.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following:

117.     Beginning no later than January 2009 and continuing until on or around April 3, 2018, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

118.     Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

119.     As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

120.    The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

        a.    competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

        b.    Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

121.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

122.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

123.    Accordingly, Plaintiff and Class members seek three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

### DEMAND FOR JURY TRIAL

124.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and the Class, demands a jury trial as to all issues triable by a jury.

**PRAYER FOR RELIEF**

125.     WHEREFORE, Plaintiff prays that this Court enter judgment on her behalf and that of the Class by adjudging and decreeing that:

a.     This action may be maintained as a class action, with Plaintiff as the designated Class representative and her counsel as Class counsel;

b.     Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of this violation;

c.     The alleged combinations and conspiracy are *per se* violations of the Sherman Act;

d.     Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, as alleged herein;

e.     Judgment be entered for Plaintiff and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

f.     Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.     Plaintiff and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.     Plaintiff and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: June 19, 2018

*/s/ Paul Mark Sandler*
Paul Mark Sandler (Bar No. 00145)
Eric R. Harlan (Bar No. 23492)
SHAPIRO SHER GUINOT & SANDLER
250 West Pratt Street, Suite 2000
Baltimore, MD 21201
Tel: (410) 385-0202
Fax: (410) 539-7611
pms@shapirosher.com
erh@shapirosher.com

Joseph R. Saveri (*pro hac vice forthcoming*)
Steve N. Williams (*pro hac vice forthcoming*)
Jiamin Chen (*pro hac vice forthcoming*)
V Chai Oliver Prentice (*pro hac vice forthcoming*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, CA 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
jchen@saverilawfirm.com
vprentice@saverilawfirm.com

***Attorneys for Plaintiff and the Proposed Class***